UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GERALD SPENCE,

          Plaintiff,

    v.

STAMBAUGH, et al.,

          Defendants.

No.  2:14-cv-1170 WBS AC P

ORDER and

FINDINGS AND RECOMMENDATIONS

I.    **Introduction**

    Plaintiff Gerald Spence is a state prisoner who proceeds pro se and in forma pauperis under 42 U.S.C. § 1983.  The action proceeds on the Third Amended Complaint (TAC), which challenges plaintiff's treatment as a pretrial detainee at the Sacramento County Jail on November 11, 2012.  See ECF No. 132.  Plaintiff alleges that he experienced excessive force at the hands of several law enforcement officers—both City of Sacramento Police Officers and Sacramento County Sheriff's Deputies—and that a third Deputy and two County Jail nurses failed to protect him from that excessive force.  All claims arise from plaintiff's booking at the Main Jail, during which he refused to participate in the medical intake process and his vital signs were accordingly taken forcibly.

////

////

The County Defendants have moved for summary judgment, and plaintiff has brought a cross-motion for summary judgment.  ECF Nos. 146, 154.[1]  Also before the court are the County Defendants' motion to strike, ECF No. 135, and plaintiff's motion for sanctions, ECF No. 164. These motions are referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c).

## II.   Overview of Claims

This case proceeds on plaintiff's claims of excessive force against County defendants Croley, Mrozinski, Mundy and Ogle, and City defendants Stambaugh and Southward (Claims Two through Four), and his failure-to-protect claims against County defendants Voss, Mencias and Wong (Claims Five and Six).[2]

The Third Amended complaint alleges in sum as follows.  Plaintiff was arrested on the afternoon of November 11, 2012, by Sacramento City Police Officers Sarah Stambaugh and Dustin Southward, who took him to the Sacramento County Main Jail.  At the jail, plaintiff refused to participate in the medical intake screening procedures by refusing to answer questions or allow measurements of his vital signs (heart rate, blood pressure, respiration) on the ground that "the last time the prosecutor used the medical intake form as evidence in the trial."  TAC, ECF No. 132 at 4.[3]  Sacramento County Sheriff's Sergeant Andrew Croley informed plaintiff that he was required to comply with medical intake procedures and, if he refused, he would be physically forced to comply.  Plaintiff refused to cooperate.

Sergeant Croley directed the officers in the booking area to seize plaintiff and take him down to the floor on his stomach, while Sacramento County Sheriff's Deputy Lynnda Voss videotaped the incident.  Plaintiff alleges that "[d]efendants, sheriff and city police[,] grabbed both of plaintiff's arms which were cuffed behind his back and both legs and shackled them too

---

[1]  The City defendants have not filed a dispositive motion.

[2]  Claim Two names Sgt. Croley; Claim Three names Deputies Mrozinski, Mundy and Ogle; Claim Four names Officers Stambaugh and Southward; Claim Five names Nurses Mencias and Wong; and Claim Six names Deputy Voss.

[3]  Page references to filed documents reflect the electronic pagination accorded by the court's Case Management/Electronic Case Filing (CM/ECF) system, not the original pagination of the documents.

tightly and four-pointed Plaintiff to the floor[.]"  ECF No. 132 at 5.  Southward centered her

weight on plaintiff's lower back "which aggravated a spondylosis condition of the L-3, that

immobilizes the Plaintiff with severe pain."  Id.  Sacramento County Sheriff's Deputies William

Mundy and Michael Ogle "were on the Plaintiff's shackled legs and feet causing significant

distress on the right ankle and leg from a spiral fracture of the fibia and tibia which never healed

properly, after two surgeries."  Id.  Sacramento County Sheriff's Deputy Christopher Mrozinski

"wrench[ed] [plaintiff's] cuffed arms to the limit behind the shoulder-blades to the neck, while

twisting the left hand clockwise at the wrist," which "activated left and [] right shoulders [sic]

rotator cuff injuries."  Id.

The TAC alleges that the "combined weight of Southward and Mrozinski, 200 lbs each,

exponentially magnified the existing chest pain from a recent rib fracture in addition to abdominal

pain from an [u]mbilical hernia, and for the first time shooting pain from the infliction of a groin

hernia from the combined stress and strain to Plaintiff's core."  Id.  Further, that "[t]he extreme

pervasive pain forcing the femoral hernia and ankle[,] the shin pain met just above the Plaintiff's

right knee with an indescribable explosion causing Plaintiff's entire body to shudder.  With his

head in the throes of a migraine from Defendant Stambaugh forcing his head to the floor, Plaintiff

suppressed a scream, for lack of oxygen. . . . [while] defendant Mrozinski [was] smiling a sadistic

smirk with malice in his eyes," and then "defendant Mundy fastened his head to the floor with his

200 plus pounds."  Id. at 6.

"[I]n the midst of this," Sacramento County Nurses Gladys Mencias and Leah Wong

sought to take plaintiff's vital signs.  Plaintiff alleges that he "was pulled, yanked, and jostled and

jerked by the cuffed sleeves in order to do a blood pressure check.  After a few attempts a nurse

said 'he's not breathing,' [but] no one relaxed pressure, and no one asked nor ordered them, not

even the two 'angels of mercy.'"  Id.  "[A] second search was conducted, just to add to the jerking

and jostling, by Mrozinski and Ogle and the handcuffs were switched still behind the back.  The

leg shackles remained in place, still too tight, cutting off his circulation.  R.N. Mencias and LVN

Wong checked the cuffs and approved their application and tightness as Plaintiff was taken to

booking being ordered to walk[.]"  TAC, ECF No. 132 at 6-7.

Plaintiff alleges that he was "placed in an isolation cell fully shackled for five hours.  The nurses returned asking to retake the vitals, which the Plaintiff refused.  Until two weeks later after being housed in general population other nurses came asking to take Plaintiff's vitals.  Once complaining to a floor nurse, who replied 'it is his right to do so.'  The vitals taken during the assault and battery were never recorded or made known to Plaintiff.  The video of the isolation cell monitored by N.J. #344 has not been located."  Id. at 7.

### III.   Preliminary Motions

Two threshold matters require the court's consideration:  (1) the County Defendants' motion to strike three "newly named" defendants identified in the TAC, and (2) plaintiff's motion for "default judgment" or other preclusive sanctions against all defendants on the alleged ground that their briefs were untimely filed.

### A.   County Defendants' Motion to Strike

The County Defendants move to strike putative defendants Pane, Cunningham and Gallinano from the TAC under Federal Rule of Civil Procedure 12(f).  ECF No. 135.  Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "Immaterial" matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded; "impertinent" matter consists of statements that do not pertain, and are not necessary, to the issues in question.  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994) (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 706-07, 711 (1990)).  "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial[.]"  Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983).

Claim Six alleges in pertinent part that Sacramento County "Sheriff's Officers" Pane, Cunningham and Gallinano, together with defendant Voss, through their "actions or inaction," "willfully, maliciously, and sadistically with callous disregard integrally participated in the excessive use of force that was illegally applied on the plaintiff," and all "failed to intervene."

4

1   ECF No. 132 at 11.  This amounts to a re-allegation of Claim Six as it was presented in the SAC,

2   ECF No. 47 at 11, which the undersigned previously found insufficient to state any cognizable

3   claim other than a failure-to-protect claim against Voss.  ECF No. 61 at 5.  The undersigned

4   specifically recommended the dismissal of putative defendants Pane, Cunningham and Gallinano,

5   id. at 6-7, and that recommendations was adopted by the district judge, ECF No. 79 at 2.  Because

6   these defendants have already been dismissed from the action, and plaintiff did not have leave to

7   resurrect claims against them in the TAC,[4] the presence of their names in the TAC is without

8   legal effect.  Accordingly, the motion to strike will be denied as unnecessary.

9            **B.  Plaintiff's Motion for "Default Judgment" or Other Sanctions**

10           Plaintiff moves for "default judgment"[5] or other preclusive sanctions against all

11  defendants on grounds that they untimely filed their responsive briefs.  ECF No. 164.  Defendants

12  have opposed the motion for sanctions and plaintiff replied.  ECF Nos. 165, 166, 167, 168.

13           All defense briefs were timely filed.  The undersigned extended the briefing schedule for

14  the summary judgment motions and excused the City Defendants' initial failure to response to

15  plaintiff's cross-motion.  See ECF Nos. 151, 154, 159.  All briefs were filed within the time

16  permitted by Local Rule 230(l) in light of the court's orders.  The motion for sanctions is denied.

17      **IV.    County Defendants' Motion for Summary Judgment**

18           **A.  Summary Judgement Standards**

19           Summary judgment is appropriate when the moving party "shows that there is no genuine

20  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

21  Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of

22  proving the absence of a genuine issue of material fact."  Nursing Home Pension Fund, Local 144

---

[4]  When the undersigned granted plaintiff leave to proceed on his TAC it was for the sole purpose of substituting defendant "Nurse L" for newly identified "LVN Leah Wong."  ECF No. 134.  The court explained that the TAC was "nearly identical" to the SAC, that "plaintiff's motion is brought in good faith, without undue delay or undue prejudice to defendants, that the facts alleged in the TAC are not inconsistent with those in the SAC, and that the addition of the newly added defendant is essential to resolving the merits of this case."  Id. at1-2.
[5]  Default judgment is available under Federal Rule of Civil Procedure 55 only when a defendant fails to plead or otherwise defend.  See generally Eitel v. McCool, 782 F.2d 1470, 1471 (9th Cir. 1986) (citation omitted).  That is not the case here.

5

1   v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010)

2   (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish

3   this by "citing to particular parts of materials in the record, including depositions, documents,

4   electronically stored information, affidavits or declarations, stipulations (including those made for

5   purposes of the motion only), admission, interrogatory answers, or other materials" or by showing

6   that such materials "do not establish the absence or presence of a genuine dispute, or that the

7   adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56

8   (c)(1)(A), (B).

9         When the non-moving party bears the burden of proof at trial, "the moving party need

10  only prove that there is an absence of evidence to support the nonmoving party's case."  Oracle

11  Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

12  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

13  against a party who fails to make a showing sufficient to establish the existence of an element

14  essential to that party's case, and on which that party will bear the burden of proof at trial.  See

15  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the

16  nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

17  circumstance, summary judgment should be granted, "so long as whatever is before the district

18  court demonstrates that the standard for entry of summary judgment ... is satisfied."  Id. at 323.

19        If the moving party meets its initial responsibility, the burden then shifts to the opposing

20  party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

21  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

22  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

23  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

24  admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

25  Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  Moreover, "[a] [p]laintiff's verified complaint

26  may be considered as an affidavit in opposition to summary judgment if it is based on personal

27  ////

28  ////

6

knowledge and sets forth specific facts admissible in evidence."  Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).[6]

The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In applying these rules, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  "This rule exempts pro se inmates from strict compliance with the summary judgment rules, but it does not exempt them from *all* compliance."  Soto v. Sweetman, 882 F.3d 865, 872 (9th Cir.) (original emphasis) (inmates remain obliged "to identify or submit some competent evidence" supporting their claims), cert. denied, 139 S. Ct. 480 (2018).

B. **Undisputed Facts**

Review of the record demonstrates that the following facts are undisputed for purposes of summary judgment:[7]

_____

[6]  In addition, in considering a dispositive motion or opposition thereto in the case of a pro se plaintiff, the court does not require formal authentication of the exhibits attached to plaintiff's verified complaint or opposition.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district court abused its discretion in not considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation and administrative documents involving another prison and letters from other prisoners" which evidence could be made admissible at trial through the other inmates' testimony at trial); see Ninth Circuit Rule 36-3 (unpublished Ninth Circuit decisions may be cited not for precedent but to indicate how the Court of Appeals may apply existing precedent).

[7]  The parties have made various evidentiary objections.  Most need not be addressed, because the matters at issue do not affect the existence of a triable issue of material fact.  The court overrules plaintiff's objections to the declarations of Sgt. Croley and Lt. McCamy as to the policies in place at the jail at the time of plaintiff's arrest.  These are matters within the personal knowledge of the declarants.  The court agrees with plaintiff that Sgt. Croley and Lt. McCamy are not qualified to

• On November 11, 2012, plaintiff Gerald Spence was arrested on a felony warrant and transported to the Sacramento County Main Jail by defendant Sacramento City Police Officers Sarah Stambaugh and Dustin Southward.

• Defendant Sacramento County Sheriff's Sergeant (now Lieutenant) Andrew Croley was the assigned supervisor for the booking/intake area of the Sacramento County Main Jail.

• Defendant Sacramento County Sheriff's Deputies Christopher Mrozinski, Michael Ogle, and William Mundy were also assigned to the intake area on this occasion.

• During the booking process, plaintiff refused to cooperate with the medical screening, claiming that at his last criminal trial the district attorney used the medical screening information against him.

• Sergeant Croley told plaintiff that if he did not cooperate with the medical screening he would be forced to comply; plaintiff continued to refuse to cooperate.  Plaintiff was not told that he needed to comply only with a "vitals check" to avoid being taken to the ground.

• Sergeant Croley directed other officers to place and hold plaintiff on the floor in a prone position so that defendant Sacramento County nurses Gladys Mencias and Leah Wong could obtain plaintiff's vital signs.

• Plaintiff was involuntarily placed on the floor, belly first.  County Defendants Mundy and Ogle assisted City police officers in gaining and maintaining physical control over plaintiff.

• Plaintiff testified that "they laid me down on the floor.  It wasn't – I mean, they didn't throw me on the floor.  It wasn't violent until they started twisting my arms and stuff."  Pl. Depo. at 26:14-6; see also id. at 30:2-6 ("I wasn't slammed.  I was just forced to the floor.  My head was being pushed on this side. . . . My head was being pushed to the ground.").

• For approximately ten minutes, plaintiff was restrained on the floor.

////

////

---

render an expert opinion as to the legal validity or significance of the policies, and does not construe the declarations as offering any such opinion.  In any event, the opinions of any party or witness as to legal matters, or the Fourth Amendment reasonableness of any action, are disregarded.

• Defendants Mundy and Ogle held plaintiff's legs and applied shackles; defendant Southward applied pressure to plaintiff's lower back; and defendant Mrozinski secured plaintiff's arms and wrists behind his back and changed out his handcuffs.

• At no time during the incident did plaintiff physically resist any officer.

• Defendant Sacramento County Sheriff's Deputy Lynnda Voss videotaped the incident while standing a few feet from plaintiff's head.

• The "Sacramento County Sheriff's Department Intake Screening" form completed thereafter by the City Officers and Wong identified no extraordinary findings. The medical portion, signed by defendants Southward and Wong, checked "no" in response to all four questions, indicating that plaintiff's vital signs were within a normal range.[8] Co. Dfs. Ex. E (ECF No. 146-4 at 17). The portion entitled "Arresting Officer's Observations/ Questionnaire" consisted of ten questions and was completed by Stambaugh who answered "no" to six of the ten questions, did not answer four questions, and wrote across the entire section "Refused to Answer."[9] Id.

• The "Incident Report Narrative (PF 10)" subsequently prepared by defendant Sacramento County Sheriff's Deputy Christopher Mrozinksi, sets forth the following summary of the incident:[10]

---

[8] "No" was checked in response to the following four questions: " Is the arrestee's temperature greater than 100.5? Is systolic BP (SBP) greater than 230 Hg or less than 80 mm Hg? Is diastolic BP (DBP) greater than 120 mm Hg or less than 50 mm Hg? Is pulse great than 125 or less than 50 beats per minute?" Co. Dfs. Ex. E (ECF No. 146-4 at 17); cf. Pl. Decl. ¶ 10 (ECF No. 154 at 115) ("My blood pressure during the incident was measured as 185/90. This was high even for me."); see also Pl. Ex. L (ECF No. 154 at 181) (indicating plaintiff had a pulse of 116 at the time of incident; the blood pressure notation is illegible).

[9] No answer was provided in response to the first four questions: "Do you have any medical conditions that may become life threatening in the next 24 hours such as diabetes or seizure? Have you been to an ER or been in an auto accident in the last 24 hours? Do you have any wounds?" "No" was checked in response to the remaining six questions: "Is there a suspicion the arrestee may have ingested or hidden drugs in a body cavity? Does the arrestee need more than minimal support for walking or standing? Does the arrestee appear to be under the influence of alcohol or drugs, or have withdrawal type symptoms? Are the charges DUI? Is the arrestee non-responsive to the above questions? Has the arrestee been pepper sprayed, tasered, or has any other form of less lethal force been used to subdue the arrestee?"

[10] Defendant Mrozinski states that the Incident Report accurately reflects the subject incident, declaring: "As a result of Spence's booking, I drafted a PF-10 report memorializing the incident.

9

I, Deputy Mrozinski #945, was assigned to the Sacramento County Main Jail.  Inmate Spence was being booked into the jail for a felony warrant by Sacramento City Police.  Spence became uncooperative and refused to be examined (vitals) by the nursing staff.  Spence also refused to answer questions asked of him by the nurse.  Sacramento City Police Officers Gallinano #267, Cunningham #789, Stambaugh #565, Pane #496 and Southward #690 placed Spence into the prone position after trying for several minutes to verbally gain his compliance.  Deputies Mundy #216 and Ogle #638 assisted City Police in maintaining control of Spence.  RN Mencias took Spence's vital sign[s] while he was prone and cleared him medically to be accepted into custody.

Leg shackles were applied to Spence by Deputy Mundy.  I changed out handcuffs on Spence and completed a search of Spence's person assisted by Ogle.  The nurse ask[ed] Spence if he was allergic to any medications.  Spence replied:  "You can give me cyanide."

Ogle and I assisted Spence to his feet to be escorted from the arrest report room to the photograph machine.  Spence spontaneously stated the following in summary:  You can ask me to do w[hat] you want, I'm not going to do it.

Spence was escorted to the photo machine, his picture taken and a right thumb print was obtained.  Based upon his actions and statements, he was escorted to segregation cell #3 and secured in the cell for his safety and the safety of others.  [The Report identifies the Initiating Officer as Mrozinski #945, and the Assisting Officer as Ogle #618.]  Spence remained in handcuffs and leg shackles.  The restraints were checked and cleared to remain in place by RN Mencias after they were applied in the arrest report room just prior to his escort.

Sgt. Croley #96 was present for Spence's medical evaluation, his escort and placement into the cell.

Video of the incident was taken by Deputy Voss #208.

[Approximately 20 minutes later] The handcuffs and leg shackles were removed from inmate Spence.

Co. Dfs. Ex. A (ECF No. 146-4 at 4-9).

• Following the incident, plaintiff complained of pain but no injuries.

• The Sacramento County Sheriff's Department Operations Order 10/04 (REV 7/07) entitled "Medical Intake Screening" (hereafter "Sheriff's Operations Order") was in effect at the

I have reviewed Exhibit A and it is a true and accurate copy of the PF-10 report.  I drafted the report immediately after the incident on November 11, 2012.  It accurately sets forth the facts as they occurred on the date of the incident."  Mrozinski Decl. ¶¶ 1-2 (Co. Dfs. Ex. I) (ECF No. 146-4 at 32).

time of the incident.  See Co. Dfs. Ex. F (ECF No. 146-4 at 19-20); see also id., Ex. J (McCamy

Decl.) (ECF No. 146-4 at 36).  The "Sheriff's Operations Order" is two pages in length and

divided into three sections.  The first section, entitled "Policy," provides in full:

> Correctional Health Services staff shall complete a health screening procedure on each arrestee at the time of booking in accordance with Article 11, Section 1207 of the California Code of Regulations, Title 15.  Any person not deemed medically fit for incarceration will not be accepted.

Co. Dfs. Ex. F (ECF No. 146-4 at 19-20).

The second section, entitled "Intake Medical Receiving Screening," provides in pertinent

part:

> B.    The intake medical screening shall minimally include observations of the subject's behavior and physical condition and inquiries into past and present illness and health problems, use of medications, drugs and/or alcohol. . . .
>
> H.  In situations where the arrestee is unable to or refuses to respond to the receiving screening questions, health personnel shall visually examine the subject for obvious or noticeable medical problems.  If the subject is accepted for incarceration, the form shall be completed at a later time when the subject becomes cooperative or communicative.

Id.

The third section, entitled "Procedures for Unfit for Incarceration," provides instructions

for referring arrestees to other agencies who are physically and/or mentally unfit for immediate

jail incarceration.  Id.

• The Correctional Health Services (CHS) Administrative Policy No. 1404 (Revised

5/2005), entitled "Receiving-Screening" ("CHS Policy") was also in effect at the time of the

incident.  See Co. Dfs. Ex. G (ECF No. 146-4 at 22-6); id., Ex. J (McCamy Decl.) (ECF No. 146-

4 at 36).  The CHS Policy is five pages in length and divided into four sections: Purpose, Setting,

Policy, and Procedure.  The first two sections provide that the "purpose" of the CHS Policy is

"[t]o describe the medical receiving-screening process for inmates at the adult jail facilities," in

the "settings" of the "Main Jail and Rio Cosumnes Correctional Center."  ECF No. 146-4 at 22.

////

////

The third section, "Policy," provides in pertinent part:

> A receiving health screening is performed by medical staff on all arrestee(s) (including transfers) immediately upon arrival at the facility. . . . The purpose of this health screening is to obtain prompt medical care for those needing it, to identify ongoing or chronic medical needs, and to detect those arrestee(s) who pose a potential threat to the health or safety of others within the general population. Baseline data is established for use in subsequent care and treatment.

ECF No. 146-4 at 22.  The "Policy" section identifies the matters that "[a]t a minimum, the screening includes." Id. at 22-3.  These several matters include "[a] complete set of vital signs and a stated height and weight." Id.

The "Procedure" portion of the CHS Policy provides in pertinent part that "Nursing Staff will provide medical evaluation on all new arrestees;" "**NO** arrestee(s) is to be accepted into the jail until he/she has completed the Receiving Screening process" (original emphasis); "All findings shall be recorded on a form approved by the Health Authority;" and "The Receiving Screening shall be conducted by the Nursing Staff at Main Jail and Rio Cosumnes Correctional Center.  This will become a part of the medical record."  Co. Dfs. Ex. G (ECF No. 146-4 at 24-5) ("Procedure" items #1A, #1C, and #3A).

• To fulfill the purpose of the medical screening policy, it is the regular practice of the jail to attempt to obtain basic information, specifically vitals, even when an inmate refuses to cooperate. When an inmate refuses to cooperate with the medical screening, Deputies and Supervisors attempt to gain voluntary compliance for vitals.  Deputies and Supervisors warn the inmate if he does not comply, he will be forced to the floor so the nurses can take his vitals.  If the inmate continues to refuse, officers lay the inmate face down on the floor in a prone position, and the intake nurse takes his vitals while is restrained.  This standard practice was followed in plaintiff's case.

• After his admission to the jail, plaintiff refused to cooperate with the taking of his vital signs and refused to answer any medical screening questions, without adverse consequences.

### C. <u>Analysis: Excessive Force Claim</u>

#### 1. **Governing Constitutional Principles**

The right of pretrial detainees to be free from excessive force is guaranteed by the Due

Process Clause of the Fourteenth Amendment and is governed by Fourth Amendment standards. Kingsley v. Hendrickson, 576 U.S. 389, 397-398, 399 (2015).  Accordingly, a pretrial detainee establishes that excessive force was used against him by showing "that the force purposely or knowing used against him was objectively unreasonable."  Id. at 396-397.  "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'"  Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  A "pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."  Kingsley, 576 U.S. at 398.

"A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  Id. at 397.  "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security."  Id. (quoting Bell v. Wolfish, 441 U.S. 520, 240 (1979)).

"Considerations such as the following may bear on the reasonableness or unreasonableness of the force used:  the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  Kingsley, 576 U.S. at 397.

### 2.  Qualified Immunity

Qualified immunity shields government officials from civil liability unless a plaintiff establishes that: (1) the official violated a constitutional right; and (2) that right was "clearly established" at the time of the challenged conduct, such that "every reasonable official" would have understood that what he is doing violates that right.  Ashcroft v. al-Kidd, 563 U.S. 731, 735, 741 (2011) (citation and internal quotation marks omitted).  These questions may be addressed in

the order most appropriate to "the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Thus, if a court decides that plaintiff's allegations do not support a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. at 236.  On the other hand, if a court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court need not determine whether plaintiff's allegations support a statutory or constitutional violation.  Pearson, 555 U.S. at 236-242.

### 3.  Discussion

As noted above, force is impermissible under the Fourth Amendment when it is "not rationally related to a legitimate governmental objective or…  is excessive in relation to that purpose." Kingsley, 576 U.S. at 398.  Put differently, a plaintiff may prevail either (1) if force was used to a *degree* that was objectively unreasonable, even if lesser force would have been reasonable, or (2) if the use of *any* force was inherently unreasonable under the circumstances. The court addresses these issues in turn.

### a.  Force Excessive to Purpose

Plaintiff has not presented evidence from which a reasonable jury could conclude that the force used to restrain him was greater than necessary to involuntarily take his vital signs.  First, he acknowledges that he was not thrown or "slammed" to the ground,[11] but objects to the fact of having been taken to the floor and restrained there against his will.  The record is devoid of evidence from which a jury could conclude that plaintiff was taken to the floor in a way that used an unreasonable degree of force.

Plaintiff has not identified any evidence of injury that might create a triable issue of fact regarding the quantum of force used to restrain him once he was on the floor.  Almost all of plaintiff's pain allegations and related deposition testimony refer to pain he experienced during restraint due to his extensive pre-existing injuries: spinal spondylosis; spiral fractures of the fibula

---

[11]  Pl. Depo. at 26:14-6 ("[T]hey laid me down on the floor.  It wasn't – I mean, they didn't throw me on the floor…"); see also id. at 30:2-6 ("I wasn't slammed.  I was just forced to the floor.")

and tibia, rotator cuff injuries in the left and right shoulders, a recent rib fracture, and an umbilical hernia.  See ECF No. 132 at 5.  Plaintiff has made ambiguous and/or inconsistent statements regarding a groin hernia and injury to his L-3 vertebra.[12]  To the extent he claims that the force used caused a new hernia or L-3 injury, his conflicting statements defeat a triable issue. Moreover, plaintiff's assertions of injury are unsupported by medical evidence and uncorroborated by contemporaneous reports.  And in light of his extensive pre-existing injuries, his lay testimony is inadmissible as to the causation of any injuries.  Accordingly, there is no evidence of injury from which a reasonable jury could infer that the degree of force used was objectively unreasonable.

Plaintiff relies on his subjective experience of pain as evidence that the force used was excessive.  In another case, testimony as to pain might create a triable issue as to the degree of force used.  However, given the plethora of pre-existing injuries identified in the TAC, plaintiff's subjective experience of pain during the restraint does not (without more) support an inference that the degree of force used was objectively unreasonable in relation to the law enforcement goal.  Also, plaintiff characterizes the restraint technique used on him as a "pain compliance hold" but—even assuming the accuracy of the characterization—the use of pain compliance techniques does not per se violate the Fourth Amendment.  See Forrester v. City of San Diego, 25 F.3d 804, 807-809 (9th Cir. 1994).  Limited use of such techniques may be reasonable within the meaning of the Fourth Amendment.  Id.  It is undisputed in this case that any pain caused by the restraint techniques, whether intended or not, was inflicted very briefly; the incident lasted only about ten minutes, the time it took to obtain plaintiff's vital signs.  Given the circumstances here, plaintiff's testimony about the severity of his pain does not support a conclusion that the degree of force used was excessive.

Plaintiff's briefing argues in places that pressure was applied to his neck in a way that cut off his breathing, but his deposition testimony and verified TAC do not actually say this.  The TAC refers vaguely to "trouble breathing" and states that one of the nurses said at one point that

---

[12] See ECF No. 132 at 5 (alleging aggravation of pre-existing L-3 injury); Pl. Depo. at 36:13-37:4 (suggesting new L-3 injury); ECF No, 132 at 8 (allegations re hernias).

1    he wasn't breathing, ECF No. 132 at 6, but nowhere directly alleges that plaintiff was unable to

2    breathe for any appreciable period of time.  Plaintiff testified at his deposition about the nurse's

3    statement, Pl. Depo. at 39:20-25, but that statement is not itself evidence of the truth of the matter

4    asserted (that plaintiff was in fact not breathing).  Plaintiff did not testify that anyone leaned on

5    his throat or otherwise obstructed his breathing.  He did testify that he suffers from breathing

6    problems generally, of an unspecified nature.  Pl. Depo. 40:15-22 ("… sometimes I'll be talking,

7    and I have no air.")  The fact that plaintiff is sometimes unable to breathe for no discernible

8    reason undercuts the probative value of his claim to have had trouble breathing during the taking

9    of his vital signs.  In sum, the equivocal evidence on this point cannot support a jury finding that

10   an unreasonable degree of force was used.

11          Plaintiff's allegation that Mzozinski gave a "sadistic smirk with malice in his eyes" while

12   restraining him, ECF No. 132 at 6, has no bearing on the substantive merits of the Fourth

13   Amendment claim.  Because an objective standard governs the claim, a defendant's subjective

14   state of mind is immaterial.  Graham, 490 U.S. at 397 (officer's motive or intent not relevant to

15   reasonableness inquiry).

16          For all these reasons, the undersigned concludes that no reasonable jury could find that

17   any defendant used force that was unconstitutionally excessive in relation to the task at hand:

18   involuntarily taking the vital signs of an uncooperative detainee.  The moving defendants are

19   entitled to summary judgment on Claims Two and Three to the extent that plaintiff alleges the

20   force used was excessive to the purpose of involuntarily taking his vital signs.

### b.  Use of Force in Any Degree

22          The real heart of this case is plaintiff's alternative theory that any force is excessive when

23   no force may permissibly be employed.  If the forcible taking of vital signs at jail intake is

24   inherently and objectively unreasonable, in violation of the Fourth and Fourteenth Amendments,

25   then the force that was used against plaintiff indeed violated his rights—whether it was officially

26   authorized by County policy or not.  This is a more difficult issue, but the court need not wade too

27   ////

28   ////

16

1    deeply into the question whether the facts relevant to the merits are in dispute.[13]  This is because

2    all County Defendants are entitled to qualified immunity unless it was clearly established on the

3    date of Mr. Spence's arrest that the use of *any* force to involuntarily obtain vital signs was

4    unconstitutional.

5        The qualified immunity inquiry turns on what a reasonable officer would have known was

6    unconstitutional under the circumstances.  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).

7    This is a purely objective inquiry.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  A right is not

8    clearly established for qualified immunity purposes "unless existing precedent 'squarely governs'

9    the specific facts at issue."  Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting

10   Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam)).  Accordingly, officers facing excessive

11   force claims are entitled to qualified immunity unless "existing precedent" put the Fourth

12   Amendment unreasonableness of particular law enforcement conduct, in a particular factual

13   context, "beyond debate."  Mullenix, 577 U.S. at 13-14 (quoting Ashcroft v. al-Kidd, supra, 563

14   U.S. at 741).  As a general rule, defendants are entitled to qualified immunity unless the district

15   court can "identify a case where an officer acting under similar circumstances . . . was held to

16   have violated the Fourth Amendment."  White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam).

17       The undersigned has identified no authority extant at the time of plaintiff's arrest (or since

18   announced) that holds the Fourth Amendment is violated by the use of force to obtain vital signs

19   involuntarily from a pretrial detainee during medical intake.  Indeed, there is a complete absence

20   of authority on the question.  Accordingly, it was not "beyond debate" at the time of defendants'

21   actions that they were violating plaintiff's rights by placing him on the floor and restraining him

22

23   _____

     [13]  Plaintiff argues that using force to take vital signs is counterproductive, because the
24   introduction of force will likely affect bodily functions such as blood pressure and heart rate,
     rendering the readings unreliable.  However, it is not the role of this court to rule on the wisdom
25   of jail policies and practices.  A misguided practice is not necessarily an unconstitutional one.
     The Supreme Court has emphasized that determining the Fourth Amendment reasonableness of
26   force "requires a careful balancing of the nature and quality of the intrusion on the individual's
     Fourth Amendment interests against the countervailing government interests at stake."  Graham
27   v. Connor, 490 U.S. 386, 396 (1989) (internal quotations omitted).  Because this case is
     resolvable on qualified immunity grounds, the undersigned does not weigh plaintiff's interests in
28   not being manhandled against the jail's need to conduct medical screening at intake.

1    so that his vital signs could be taken at medical intake.  See al-Kidd, 563 U.S. at 741.  And as the

2    court has already determined, plaintiff has not produced evidence sufficient for a jury to find that

3    the *degree* of force used was unreasonable in relation to that purpose.

4           Because no clearly established law provided that the taking of vital signs by force violates

5    the Constitution, defendant Croley is entitled to qualified immunity on Claim Two and defendants

6    Mrozinski, Mundy and Ogle are entitled to qualified immunity on Claim Three, insofar as those

7    claims challenge the use of force to obtain vital signs.

8           **D.  Analysis: Failure to Protect Claim**

9                   **1.  Governing Constitutional Principles**

10          Jailers have a duty to protect pretrial detainees from violence.   Castro v. County of Los

11   Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016).  The elements of a pretrial detainee's Fourteenth

12   Amendment failure-to-protect claim against an individual officer are as follows:

13
             (1) The defendant made an intentional decision with respect to the
14           conditions under which the plaintiff was confined;

15           (2) Those conditions put the plaintiff at substantial risk of suffering
             serious harm;

16           (3) The defendant did not take reasonable available measures to abate
17           that risk, even though a reasonable officer in the circumstances
             would have appreciated the high degree of risk involved – making
18           the consequences of the defendant's conduct obvious; and

19           (4) By not taking such measures, the defendant caused the plaintiff's
             injuries.

20           With respect to the third element, the defendant's conduct must be
21           objectively unreasonable, a test that will necessarily "turn[] on the
             facts and circumstances of each particular case.

22   Id. at 1071 (fn., citations, internal quotation marks and punctuation omitted).

23                  **2.  Discussion**

24          The recommended disposition of the excessive force claims compels the same result on

25   plaintiff's failure to protect claims.  Because no clearly established law provided that the taking of

26   vital signs by force violates the Constitution, defendants Voss, Mencias and Wong are entitled to

27   qualified immunity to the extent that plaintiff challenges their failure to prevent the use of force.

28   And because plaintiff has not presented evidence sufficient to go to trial on the theory that the

quantum of force used was unreasonable in relation to the goal of restraining him for the stated

purpose, Voss, Mencias and Wong are entitled to summary judgment on the merits.  In sum,

plaintiff has not presented evidence of an essential element of his claim: that there was an

excessive use of force from which these defendants might have protected him.  The motion for

summary judgment should therefore be granted to Mencias and Wong on Claim Five and to Voss

on Claim Six.

### V.      Plaintiff's Motion for Summary Judgment

Because the County Defendants are entitled to summary judgment, both on the merits and

on grounds of qualified immunity, plaintiff's motion for summary judgment must be denied with

regards to Claims Two, Three, Five and Six.

As to Claim Four against the City Defendants, Officers Stambaugh and Southward,

plaintiff has not demonstrated that the undisputed facts entitle him to summary judgment.  To the

contrary, for the reasons explained above regarding the County Defendants, plaintiff's evidence

does not support the essential elements of an excessive force claim against any defendant.

Plaintiff has identified no evidence that requires a different result as to the claim against

Stambaugh and Southward.  To the extent plaintiff seeks to predicate liability on the use of force

itself, the City Defendants are entitled to qualified immunity for the same reasons as the County

Defendants.  To the extent plaintiff seeks to predicate liability on the degree of force used, his

proof fails.

Claim Four of the TAC alleges in conclusory terms that Officers Stambaugh and

Southward "integrally participated in the assault."  ECF No. 132 at 10.  The specific allegations

against the two City police officers are sparse; the evidence against them even more so.  Plaintiff

asserts that Southward's weight on plaintiff's back aggravated his spondylosis, id. at 5, but even

if true this fact does not support a finding that Southward used a degree of force greater than

necessary to keep plaintiff prone on the floor.  Plaintiff alleges that Stanbaugh was responsible for

holding his head to the floor, id. at 5-6, but despite plaintiff's description of his own great distress

there is no evidence that Stanbaugh restrained his head in an objectively unreasonable manner.

To the extent that Stanbaugh is the officer plaintiff blames for his alleged difficulty breathing,

19

there remains insufficient evidence to support a finding that she used more force than necessary to restrain plaintiff.[14]  Plaintiff's claims against the City Defendants thus rest more on their participation in the overall act of restraint, which was pursuant to County policy or practice, than on any specific contributing act of Southward or Stanbaugh.  Accordingly, plaintiff's motion for summary judgment fails as to the City Defendants for the same reasons that it fails as to the County Defendants.

In their opposition to plaintiff's summary judgment motion, the City Defendants expressly assert qualified immunity on the same grounds as the County defendants, and join the County Defendants' factual contentions regarding the reasonableness of the force used and arguments regarding plaintiff's failure of proof.  ECF No. 161 at 5, 6.  They request the opportunity to bring their own summary judgment motion, given the undersigned's decision to entertain a cross-motion from plaintiff that was filed after the dispositive motion deadline.  Id. at 5.  That will not be necessary.

**VI.     Summary Judgment in Favor of City Defendants**

It is well established that a court may grant summary judgment sua sponte in favor of a non-moving party so long as the party that had moved for summary judgment had reasonable notice that the Court might do so and so long as the party against whom summary judgment was rendered had "a full and fair opportunity to ventilate the issues involved in the motion."  Cool Fuel, Inc. v. Connett, 685 F.2d 309, 312 (9th Cir. 1982); see also Columbia Steel Fabricators v. Ahlstrom Recovery, 44 F.3d 800, 802–803 (9th Cir. 1995); Abagninin v. AMVAC Chemical Corp., 545 F.3d 733, 742 (9th Cir. 2008).  Here, the interests of the moving and non-moving defendants are entirely aligned, and plaintiff has had a full and fair opportunity to ventilate all the issues.

Plaintiff was fully aware from the County Defendants' motion for summary judgment, and from both oppositions to his own motion, that the sufficiency of his excessive force claims was in issue and was being challenged on grounds equally applicable to all defendants.  See United

---

[14]  As noted above, plaintiff's testimony implying that he could not breathe is too equivocal to support a finding that force was applied to his neck.

20

1   States v. 14.02 Acres of Land More or Less in Fresno County, 547 F.3d 943, 955 (9th Cir. 2008)

2   (sua sponte grants of summary judgment appropriate only where the losing party has had

3   reasonable notice that the sufficiency of his claim is in issue).  The near total overlap in plaintiff's

4   theories of liability as to the City and County Defendants, the City Defendants' clear assertion of

5   qualified immunity on grounds identical to the County Defendants, and the opportunity that

6   plaintiff has had to respond to the City Defendants' briefing, all support an entry of summary

7   judgment in favor of the City Defendants for the reasons previously explained.  That will be the

8   recommendation.

9                                           **Conclusion**

10          For the reasons set forth above, IT IS HEREBY ORDERED that:

11          1.  The County Defendants' motion to strike, ECF No. 135, is DENIED.

12          2.  Plaintiff's motion for sanctions against all defendants, ECF No. 164, is DENIED.

13          Further, IT IS HEREBY RECOMMENDED that:

14          1.  The County Defendants' motion for summary judgment, ECF No. 146, be GRANTED;

15          2.  Plaintiff's cross-motion for summary judgment, ECF No. 154, be DENIED;

16          3.  Summary judgment be entered for the City Defendants on Count Four; and

17          4.  Final judgment be entered accordingly.

18          These findings and recommendations are submitted to the United States District Judge

19   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty (30) days

20   after being served with these findings and recommendations, any party may file written

21   objections with the court and serve a copy on all parties.  Such a document should be captioned

22   "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

23   failure to file objections within the specified time may waive the right to appeal the District

24   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

25   DATED: March 11, 2021

26                                                  _____
                                                    ALLISON CLAIRE
27                                                  UNITED STATES MAGISTRATE JUDGE

28